NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JAMES CLAUSELL, | : | |
| | : | |
| Petitioner, | : | Civil Action No.: 04-3857 |
| | : | |
| v. | : | |
| | : | |
| LYDELL B. SHERRER, et al., | : | **OPINION** |
| | : | |
| Respondents. | : | |

APPEARANCES:

James Clausell, pro se
#203604/ SBI # 233324B
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Carol Lee Tang
Office of the Burlington
County Prosecutor
49 Rancocas Road
Mount Holly, NJ 08060

HILLMAN, District Judge

Petitioner, James Clausell, filed the within petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254.  Respondent has filed an Answer.  The Court has considered all submissions. For the reasons set forth below, the Petition will be DENIED.

BACKGROUND

1.   Factual Background

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply reproduce the Appellate Division's factual recitation:

In the summer of 1984, Edward Atwood, Valerie Gale Atwood, his wife, and Darrell and Tanya Atwood, their children, resided at 62 Malboro Lane in Willingboro, New Jersey.  Roland Bartlett, also known as "Pops," the head of a Philadelphia drug-distribution ring commonly referred to as the "mini-mob" or "the family," owned numerous properties including a home directly behind the Atwoods'.  Bartlett had a dog which he kept outside at his Willingboro home, but which he did not clean up after.  During that summer the dog's feces accumulated to the point that the Atwoods were unable to sit on their back patio because of the odor.  Bartlett also neglected the dog, and Atwood often gave the animal water.  Eventually, Atwood contacted Animal Control and filed a complaint in municipal court.  As a result, Bartlett received a fine for the failure to remove the excrement.

At some point that summer, Bartlett spoke to his employee, Darryl Cherry, who was responsible for controlling and managing the street distribution of drugs for the organization, about problems he was having with Atwood and several of his other neighbors in Willingboro. Cherry testified that Bartlett told him to "relieve the pressure," meaning that Bartlett wanted the people who were giving him problems to be shot.  Bartlett also told Cherry that he wanted the job done by defendant and Wright, intermittently employed "floor walkers" or overseers at the Fleetwood club, a Philadelphia night club, owned by Bartlett.

Cherry followed through on Bartlett's orders by contacting Lorenzo Werts, who was responsible for distributing drugs and collecting funds for the organization.  Cherry told Werts to bring defendant and Wright to a specified location to discuss the problem Bartlett was having with Atwood.  According to Werts, a meeting was subsequently held between Cherry, Werts, defendant, Wright and Tony Bartlett, Bartlett's son, during which they discussed Bartlett's receipt of a $25 fine "over some dog problem."  Cherry tried to speak to both defendant and Wright, but had only met with Wright. Cherry testified that defendant's and Wright's compensation for shooting Atwood was to be reemployed at the Fleetwood and "a little something else."

After the meeting, according to Werts, Cherry drove defendant and Wright to see where Atwood lived.

2

Cherry denied at trial that he had directed anyone to Atwood's house, although he had previously given a statement to the prosecutors in which he admitted he had driven Wright, not defendant, to point out Atwood's house.

Shortly after that meeting, Werts picked up a gun from one of Bartlett's body guards and gave it to Cherry, who sold the gun to Wright.  Werts testified that defendant was present during the exchange.  Werts initially described the gun as a .44 or .357 Magnum, but later testified that the gun was a .38 Smith and Wesson, with a brown handle.

After obtaining a gun, defendant and Wright were still unable to complete the job because they did not have transportation to Willingboro.  As a result, sometime in early August 1984, defendant and Wright asked Jennifer Schall, defendant's brother's girlfriend, a cocaine dealer, if she would drive them to New Jersey on an unspecified date for an unspecified reason. Schall, who identified defendant at trial, agreed.

On August 11, 1984, defendant told Schall that they wanted to go to New Jersey that night.  Defendant then informed Werts that they were going to New Jersey. Additionally, as Cherry would later testify in the trial against Bartlett, defendant had contacted him and told him that they had transportation and were getting ready "to go take care of the job."

According to Schall, before defendant entered her car at approximately 9:00 p.m. that night, he placed an object wrapped in newspaper in the trunk.  Schall testified that defendant was wearing a black velor sweatshirt and Wright was wearing jeans and a white T-shirt.  She described Wright as taller and heavier than defendant.

Schall drove, defendant was seated in the passenger seat and Wright was seated in the rear.  Wright gave Schall directions during the drive from Philadelphia to New Jersey.  While driving, Schall asked them about the purpose of the trip and they responded that they needed to collect "drug money."  Schall asked them what they would do if the man did not have the money, and they responded that "they would beat him up."

3

According to Schall, defendant and Wright had told her that they were going to Mount Holly, but as they reached their destination she began to notice signs for Willingboro. Eventually they reached a "nice development of two-story homes." As they passed one house, Schall overheard defendant ask Wright "is that Pop's house?" Schall did not hear Wright's response, so she asked him if Pop's lived "over there." Wright responded "no, he doesn't live here."

On one particular street, one of the men asked Schall to drive slowly. As they passed one of the houses, defendant and Wright began to whisper. She overheard them discussing whether anyone was home at that house. Shortly thereafter, Schall was instructed to stop the car, which she did. Defendant removed the object wrapped in newspaper from the trunk, and then both men walked towards the house, while Schall waited in the car.

At approximately 10:45 p.m. that evening, Valerie Atwood and her daughter Tanya, who was twelve years old at the time, answered a knock at the front door. A man standing directly in front of the door said "Ed," and Valerie responded: "He isn't in." Another man standing to the side of the door close to the bushes said "I told you, man." When Valerie looked at the man standing to the side of the door, he put his hand up covering the side of his face. She then looked at the man standing in front of the door and asked for his name, to which he replied, "Dwayne." The two men left.

After her mother closed the door, Tanya said "Daddy doesn't know them." Because the men were also unfamiliar to Mrs. Atwood, she asked her son Darrell, who was fourteen years old at the time and who was upstairs in his room, to look out the front window and tell her if he recognized the two men who were walking up the street. Darrell told his mother that he did not recognize the men.

When defendant and Wright returned to Schall's car, she observed that defendant was carrying an object wrapped in his sweatsuit jacket. Upon entering the car defendant placed the wrapped object on the floor in front of him. Wright sat in the back seat. Schall overheard defendant and Wright discuss the fact that the man they were looking for was not home, that

4

his van was not in the driveway and that they
would wait for him.

Eventually, Schall saw car lights approaching.
Wright instructed Schall to make a U-turn and drive
slowly back down the street.  As Schall passed the
Atwood's home, she observed a van in the driveway
and two men, one of whom was older.  As she turned
to ask Wright why he wanted to talk to the man, she
saw that Wright was holding a gun.  Upon seeing
the gun, Schall panicked and "stepped on the gas."
Wright became angry and instructed her to drive
around the block and park down the street from the
Atwood home.  As defendant and Wright exited the car
Schall observed that defendant was holding the gun.
Schall again waited in the car as the men walked up
the street.

Between 11:30 p.m. and 11:45 p.m., Atwood and
his grandparents, Hubert and Bessie Dixon, had returned
home from a basketball game.  While Edward and Valerie
Atwood were in the kitchen, Tanya came downstairs and
saw through the glass panels on the front door that the
two men who had come by earlier were standing outside.
Tanya also testified that Wright had his hands behind
his back and appeared to be "doing something."
She told her parents that the men were back, and Atwood
proceeded down the hallway towards the front door
followed by Mrs. Atwood, Tanya, and Bessie and Hubert
Dixon.  As they walked toward the door, Tanya heard
a knock.  At the same time Darrell, who was upstairs,
heard his sister talking to his parents, came out
of his bedroom and sat down on the top step of the
stairs facing the front door.

When Atwood opened the interior wood and glass
door, Wright, the taller of the two men, was standing
in front, and the other shorter man stood to the side.
Through the screen door, Wright said "Ed."  Atwood
responded "[y]ou [sic] got the wrong guy," and moved
quickly to close the door.  Darrell testified that it
appeared that his father had seen something to his left,
where the shorter man was standing.  Darrell then saw
Wright move to his father's right, and the shorter man
step forward pointing the gun at his father.  At that
point Darrell heard a "pop" and saw his father fall
to the ground.

Responding to the shot, Mrs. Atwood pushed Tanya to the floor and Tanya in turn pushed her great-grandmother out of the way. Tanya then crawled towards her father. According to Darrell, the shorter man then stepped closer to the door, peered through the glass, and fired another shot downward through the screen and interior door. Tanya saw the flash of a gun, but not the gun, as the bullet passed her face. Mrs. Atwood managed to lock the door and told Darrell to call the police.

Meanwhile, as Schall waited for defendant and Wright to return, she heard two gunshots and from a different direction, the sound of breaking glass. Approximately at the same time, Shelton Austin, who was fifteen years old at the time, had returned from an amusement park to his home on Millbrook Drive which was intersected by Marlboro Lane and upon opening his front door dropped a glass souvenir mug. After dropping the mug he heard two "faint bangs," which he thought were firecrackers, coming from the direction of Marlboro Lane. Just afterward, he saw two young African-American men running from the direction of Marlboro Lane, across his neighbor's lawn and enter the car that was parked directly in front of his house. When the two men entered the car, the interior light went on and Austin observed that the driver of the vehicle appeared to be a caucasian or light-skinned African-American female.

Defendant reached Schall's vehicle first, opened the car door allowing Wright to climb into the back seat, and then threw the gun to the front seat floor and got into the car. According to Schall, both Wright and defendant appeared "tense and excited." They told Schall, "let's go" and she drove away quickly. Wright became "upset" when Schall missed the first turn out of the neighborhood, and gave her directions back to Philadelphia.

On the return trip, defendant and Wright became noticeably calmer as they got close to Philadelphia and discussed going to the Fleetwood Club to be paid. Schall asked them what had happened. Wright told her that he had the gun and that he was supposed to jump out of the bushes, but he "messed up," and the gun got caught in his jacket. Wright also said he had shot through the man's front door, and that he was shooting low because he was aiming at the man's legs. Wright did not think

6

he had hit the man.  Defendant responded that he would
"have done it right."  Schall testified that she believed
that they were trying to deceive her in relating the
events of the night.

. . .

Atwood was rushed to the hospital having suffered
a bullet wound to the chest.  He was pronounced dead at
2:03 a.m. on August 12, 1984.

(State v. Clausell, A-4947-95T4 (April 1, 1999), pp. 5-13).

## 2.  Procedural Background

On October 31, 1984, the Burlington County Grand Jury

indicted Petitioner and co-defendant Dwayne A. Wright for first-

degree capital murder of Edward Louis Atwood, in violation of

N.J.S.A. 2C11-3(a)(1)(2) (count one); first-degree murder, in

violation of N.J.S.A. 2C:11-3 (count two); fourth-degree

aggravated assault against Valerie Gale Atwood, Tanya Yolanda

Atwood, Darrell Lamont Atwood, Bessie Dixon and Hubert Dixon, in

violation of N.J.S.A. 2C:12-1(b)(4) (counts three through seven);

second-degree possession of a weapon for an unlawful purpose, in

violation of N.J.S.A. 2C:39-4(a) (count eight); third-degree

unlawful possession of a weapon, in violation of N.J.S.A. 2C:39-

5(b) (count nine); and first-degree conspiracy, in violation of

N.J.S.A. 2C:5-2 (count ten).

Petitioner proceeded to a jury trial along with his co-

defendant.  A jury found that Petitioner had committed the

purposeful murder by his own act, thereby implicitly finding that

7

Petitioner, not his co-defendant, had shoot Atwood.  The jury convicted Petitioner of capital murder, three counts of aggravated assault against Valerie Atwood, Tanya Atwood and Dessie Dixon, possession of a firearm with the purpose to use it unlawfully against the person of another, and possession of a handgun without a permit.  Petitioner was acquitted of the aggravated assault charges against Darrell Atwood and Hubert Dixon.

During the penalty phase of the trial, the jury unanimously found that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt, and Petitioner was sentenced to death.

Petitioner appealed to the New Jersey Supreme Court as of right, and in 1990, Petitioner's conviction was overturned and the case was remanded for a new trial.

Instead of retrying Petitioner, on November 29, 1990, the Burlington County Prosecutor moved to sentence Petitioner for non-capital murder.  The trial court granted the motion and sentenced Petitioner to a thirty-year term without parole for non-capital murder.  The New Jersey Superior Court, Appellate Division reversed the trial court and remanded the case for trial.  The New Jersey Supreme Court denied certification and the Appellate Court denied the State's motion for reconsideration.

The State then appealed to the New Jersey Supreme Court, which denied certification in 1995.

Petitioner then moved to dismiss the capital murder count of the indictment.  The prosecutor, in response, convened a second grand jury on August 29, 1995, which returned a superceding indictment against Petitioner charging first-degree capital murder of Edward Atwood, in violation of N.J.S.A. 2C:11-3(a)(1)(2) (count one); first-degree murder, in violation of N.J.S.A. 2C:11-3(a)(1) (count two); fourth-degree aggravated assault against Valerie Gale Atwood, Tanya Atwood, and Bessie Dixon, in violation of N.J.S.A. 2C:12-1(b)(4) (counts three through five); second-degree possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a) (count six); and third-degree unlawful possession of a weapon, in violation of N.J.S.A. 2C:39-5(b) (count seven).

In September, 1995, Petitioner moved to dismiss the superceding indictment, which motion was denied by the trial court.  Petitioner's emergent application for leave to appeal and a stay was denied by the Appellate Court.  Petitioner's motion for leave to appeal to the New Jersey Supreme Court was also denied.

During that same time, September, 1995, jury selection commenced, and on September 28, 1995, the prosecutor moved to determine whether the jury panel was lawfully summoned,

9

notwithstanding that the process was not in conformance with the recently adopted amendment to N.J.S.A. 2B:20-2(a).  The trial court treated the motion as a challenge to the array, and denied it.  Petitioner filed an emergent motion for leave to appeal that decision, which the Appellate Division denied.

Petitioner was retried from December 4, 1995, to January 19, 1996.  At the conclusion of the trial, the jury found Petitioner guilty of first-degree murder (count two), aggravated assault (counts three through five) and the weapons related offenses (count six and seven).  Petitioner was found not guilty of capital murder, and, therefore, was not subject to the death penalty because the jury concluded that Petitioner did not knowingly or purposely cause Atwood's death, but instead intended to cause only serious bodily injury likely to result in death.

On February 23, 1996, Petitioner was sentenced to life imprisonment with a thirty-year parole disqualifier on count two. Petitioner also received concurrent terms of eighteen months' incarceration with an eighteen-month parole disqualifier on counts three through five, which were to run consecutive to the term imposed on count two.  Count six merged with count two.  On count seven, Petitioner received a concurrent term of five years.

Petitioner thereafter appealed and on April 1, 1999, the New Jersey Superior Court, Appellate Division denied Petitioner's appeal.

10

Petitioner thereafter filed a pro se petition for post-conviction relief ("PCR").   Theodore Sliwinski, Esquire, was assigned to represent Petition at the PCR proceedings, and filed a brief in support of Petitioner's claims.   Petitioner filed a pro se supplemental brief.   The State filed a brief in opposition.   On February 8, 2002, the Superior Court heard oral argument on Petitioner's motion.   On April 11, 2002, the court filed a written opinion denying Petitioner's petition as well as his request for an evidentiary hearing.   On April 17, 2002, Petitioner wrote to the court asking for reconsideration.   On April 23, 2002, the court denied Petitioner's request.

On June 11, 2002, Petitioner filed a notice of appeal of the denial of his PCR.   The Superior Court, Appellate Division, affirmed the denial of Petitioner's petition in a decision dated December 10, 2003.   The New Jersey Supreme Court denied Petitioner's subsequent request for certification on April 26, 2004.

Petitioner filed the instant motion for habeas relief on August 9, 2004.   Respondents filed an answer to Petitioner's habeas motion on February 16, 2005.   On May 10, 2005, June 17, 2005, August 12, 2005 and January 27, 2006, Petitioner requested extensions of time with which to file a traverse.   This Court left the matter open in excess of one year to afford Petitioner the time necessary to craft a response to Respondents' Answer.

11

Petitioner to date has failed to file a traverse.  This Opinion is therefore a result of the submissions before it, specifically, Petitioner's habeas motion and Respondents' Answer.  See Advisory Committee Notes, Rule 5, Rules Governing Section 2254 Cases (finding that although Petitioner may file a traverse, their function " . . . tends to be a mere pro forma refutation of the return, serving little if any expository function.  In the interests of a more streamlined and manageable habeas corpus procedure, it is not required except in those instances where it will serve a truly useful purpose").

**DISCUSSION**

**Petitioner's Claims.**

Petitioner asserts the following arguments for habeas relief:

> GROUND ONE - TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO SUBPOENA CAROLYN WRIGHT, MOTHER OF CO-DEFENDANT.
>
> GROUND TWO - STATE DEPRIVED PETITIONER OF RIGHT TO COMPULSORY AND DUE PROCESS BY HINDERING THE TESTIMONY OF CAROLYN WRIGHT.
>
> GROUND THREE - THE STATE WITHHELD FAVORABLE DISCOVERY AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO SPECIFICALLY REQUEST MATERIAL.
>
> GROUND FOUR - STATE VIOLATED RIGHT TO SPEEDY TRIAL AND COUNSEL FAILED TO PROTECT PETITIONER'S RIGHT BY NEVER FILING ANY MOTION TO DISMISS.
>
> GROUND FIVE - PROSECUTOR COMMITTED BATSON VIOLATION AND TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO RAISE THE VIOLATION.

12

GROUND SIX - TRIAL COUNSEL WERE INEFFECTIVE IN
INSISTING THAT JURY BE TOLD THAT PETITIONER WAS BEING
"RE-TRIED" FOR MURDER.

GROUND SEVEN - TRIAL COUNSEL WERE INEFFECTIVE IN
CONDUCTING INADEQUATE CROSS-EXAMINATION OF DARRELL
ATWOOD.

GROUND EIGHT - PETITIONER WAS DENIED RIGHT TO FAIR
TRIAL BY OFFICIAL AND PROSECUTORIAL MISCONDUCT WHICH
INFECTED ENTIRE PROCEEDINGS.

GROUND NINE - TRIAL COUNSEL WERE INEFFECTIVE IN FAILING
TO FILE MOTION TO DISQUALIFY JUDGE SULLIVAN WHEN HE
REFERRED TO PETITIONER AS AN "ASSASSIN."

GROUND TEN - SUPERCEDING INDICTMENT WAS PRODUCT OF
PROSECUTORIAL VINDICTIVENESS.

GROUND ELEVEN - PROSECUTORIAL MISCONDUCT VIOLATED DUE
PROCESS BY KNOWINGLY PRESENTING FALSE TESTIMONY TO
GRAND JURY.

GROUND TWELVE - CHARGING CAPITAL MURDER WHEN THERE IS
NO EVIDENCE TO SUPPORT IT VIOLATES RIGHT TO FAIR TRIAL
BECAUSE IT IMPEDES THE CONFRONTATION OF WITNESSES
AGAINST HIM.

GROUND THIRTEEN - COURT ERRED IN ADMITTING GUN INTO
EVIDENCE WHERE CHAIN OF CUSTODY OR EVIDENCE PROVING
THAT WAS THE GUN WAS NOT ESTABLISHED.

See Petition for Writ of Habeas Corpus.

**Standards Governing Petitioner's Claims.**

Section 2254 of Title 28, United States Code, provides that
the district court "shall entertain an application for a writ of
habeas corpus on behalf of a person in custody pursuant to the
judgment of a State court only on the ground that he is in
custody in violation of the Constitution or laws or treaties of
the United States."  28 U.S.C. § 2254(a).

13

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of the state trial and appellate courts.  See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus.  The statute reads as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court explained the application of § 2254(d)(1).  The Court analyzed subsection 1 as two clauses:  the "contrary to" clause and the "unreasonable application" clause.  The Court held that under the "contrary to" clause, "a federal court may grant the writ if the state court arrives at a conclusion opposite to

14

that reached by [the Supreme] Court on a question of law or if
the state court decides a case differently than [the Supreme]
Court has on a set of materially indistinguishable facts."   Id.
A federal court may grant the writ under the "unreasonable
application" clause, if "the state court identifies the correct
governing legal principle from [the Supreme] Court's decisions
but unreasonably applies that principle to the facts of the
prisoner's case."   Id. at 413.   Habeas relief may not be granted
under the "unreasonable application" clause unless a state
court's application of clearly established federal law was
objectively unreasonable; an incorrect application of federal law
alone is not sufficient to warrant habeas relief.   See id. at
411; see also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000),
cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI
Albion, 171 F.3d 877, 891 (3d Cir.), cert. denied, Matteo v.
Brennan, 528 U.S. 824 (1999).   Thus, the federal court must
decide whether the state court's application of federal law, when
evaluated objectively and on the merits, resulted in an outcome
that cannot reasonably be justified under existing Supreme Court
precedent.   See Werts, 228 F.3d at 197; see also Jacobs v. Horn,
395 F.3d 92, 100 (3d Cir. 2005).

    With regard to 28 U.S.C. § 2254(d)(2), a federal court must
confine its examination to evidence in the record.   See Abu-Jamal
v. Horn, 2001 WL 1609690, at *12 (E.D. Pa. December 18, 2001).

                                15

In addition, the state court record should be reviewed to assess the reasonableness of the state court's factual determinations. See id. Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1). The Court of Appeals for the Third Circuit has ruled that this presumption of correctness can be overcome only by clear and convincing evidence. See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001)(citing 28 U.S.C. § 2254(e)(1)). "A finding that is well-supported and subject to the presumption of correctness is not unreasonable." Abu-Jamal, 2001 WL 1609690 at *12 (citing Duncan, 156 F.3d at 198).

Furthermore, federal habeas courts ordinarily refrain from revisiting credibility determinations as "it would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review." Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir. 2001). A habeas petitioner therefore "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520

16

(1972).  A <u>pro</u> <u>se</u> habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  <u>See</u> <u>Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v. Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert. denied</u>, 399 U.S. 912 (1970).

## Ineffective Assistance of Counsel - Petitioner's Grounds One, Three, Four, Five, Six, Seven and Nine.

Petitioner claims that he was subjected to ineffective assistance of counsel because his trial attorneys: failed to subpoena a witness (Ground One); failed to request favorable evidence from the State (Ground Three); failed to motion for dismissal based on the State's speedy trial violations (Ground Four); failed to motion for the State's <u>Batson</u> violation (Ground Five); insisted that the jury be told that Petitioner was being "re-tried" for murder (Ground Six); failed to conduct an adequate cross-examination of Darrell Atwood (Ground Seven); and failed to file a motion to disqualify the trial judge when the judge referred to Petitioner as an "assassin" (Ground Nine).  The respondent contends that Petitioner fails to establish ineffective assistance of counsel pursuant to the <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) standard.

In <u>Strickland</u>, the United States Supreme Court held that in order to establish that trial counsel is ineffective, the petitioner must show that "counsel's performance was deficient,"

in that "counsel made errors so serious that counsel was not
functioning as 'counsel' guaranteed . . . by the Sixth
Amendment," and "that the deficient performance prejudiced the
defense." Id. at 687.  In order to establish prejudice, the
defendant must show "a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding
would have been different." State v. Fritz, 105 N.J. 42, 60-61
(1997)(quoting Strickland, 466 U.S. at 694).  "In any case
presenting an ineffectiveness claim, the performance inquiry must
be whether counsel's assistance was reasonable considering all
the circumstances." Strickland, 466 U.S. at 688.  The Supreme
Court further explained:

> Judicial scrutiny of counsel's performance must be
> highly deferential. It is all too tempting for a
> defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has
> proved unsuccessful, to conclude that a particular act
> or omission of counsel was unreasonable.  A fair
> assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time. Because
> of the difficulties inherent in making the evaluation,
> a court must indulge a strong presumption that
> counsel's conduct falls within the wide range of
> reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the
> circumstances, the challenged action "might be
> considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v. Wheatherwax, 77 F.3d 1425, 1431 (3d Cir. 1996), cert. denied 519 U.S. 1020 (1996).

### Ground One

Petitioner first ineffective assistance of counsel claim contends that trial counsel failed to subpoena a witness, specifically, Carolyn Wright, Petitioner's co-defendant's mother. Petitioner alleges that a defense investigator interviewed Ms. Wright, who informed him that her son had told her that he was the person who fired the weapon and killed Edward Atwood, and that she further provided a tape-recorded statement alleging that same fact. Additionally, on October 12, 1999, Ms. Wright wrote a letter to Petitioner stating that she was told by law enforcement that her son fired the shots that killed the victim. Ms. Wright did not provide a certification or affidavit of the alleged confession to her by her son.

The Honorable John A. Almeida, New Jersey Superior Court Judge, considered this very matter in his letter opinion dated April 11, 2002, which was issued in response to Petitioner's PCR motion. That court found that there was no deficiency in trial counsels' performance regarding Ms. Wright. The court held that the overall results of the trial would not have been altered as there was an abundance of evidence placing Petitioner at the Atwood residence with the purpose to shoot Edward Atwood.

19

This Court is in concurrence with the state court's
determination in this regard.  The purpose of why trial counsel
did not subpoena Ms. Wright is unknown.  Perhaps trial counsel
felt that she was not credible, or that her testimony was hearsay
and therefore inadmissible.  Regardless of trial counsels'
reasoning, this Court will give proper deference to their trial
strategy.  Further, Petitioner fails to show that the result of
his case would have been different had Ms. Wright testified.  See
Strickland, 466 U.S. at 688; Fritz, 105 N.J. 60-61.  The evidence
presented to the jury included multiple eyewitnesses, including
those who participated in the planning of Atwood's murder with
Petitioner, those who witnessed Petitioner at Atwood's home with
a gun in his hand, and those who recalled post offense statements
made by Petitioner regarding Atwood's death.  Additionally,
during Petitioner's own testimony he admitted that he was at
Atwood's house at the time of the murder.  Therefore, Petitioner
has failed to show a clear error on trial counsels' part, or that
the proposed error prejudiced Petitioner's case.  As such, this
Ground of habeas relief shall be denied.

### Ground Three

Petitioner further argues that the State withheld
exculpatory evidence that trial counsel failed to specifically
request, thus rendering him ineffective.  Petitioner asserts that
the State withheld a July 15, 1986 statement by Darryl Cherry

which contained assertions that Petitioner did not fire the weapon. The State had forwarded other discovery which reflected that the statement and the assertion within the statement existed, but that trial counsel failed to "follow up" to obtain or attempt to obtain said statement.

This issue was previously raised before the New Jersey Superior Court on Petitioner's PCR motion. The court held that trial counsel took laudable efforts to obtain discovery from the State regarding Mr. Cherry and secure his testimony during trial. The court further held that such efforts were hampered by the fact that Mr. Cherry was in the federal witness protection program. The court determined that trial counsel's efforts regarding Mr. Cherry were sufficient to ensure that Petitioner received a fair trial and held that Petitioner's argument in this regard held no merit.

This Court agrees. Not only did trial counsel take significant effort to ensure Mr. Cherry's appearance at trial, he also took significant effort to obtain discovery from the State, which freely admitted to the trial court that they were having trouble securing discovery from the federal authorities. Additionally, trial counsel did secure Mr. Cherry's presence at Petitioner's trial, and successfully obtained direct testimony from Mr. Cherry that Wright, not Petitioner, fired the weapon. The jury simply did not believe that portion of Mr. Cherry's

testimony.  A written statement from Mr. Cherry attesting to that same assertion would not have been any more successful in swaying the jury when direct testimony failed.

As such, Petitioner fails to demonstrate error on the part of trial counsel, or that the proposed error prejudiced Petitioner.  Therefore, this Ground for relief shall also be denied.

### Ground Four

Petitioner next argues that the State violated Petitioner's right to a speedy trial and that trial counsel was ineffective for failing to file a motion to dismiss on that basis. Petitioner states that he filed a motion for speedy trial in 1992, after the reversal of his original conviction in 1990. Petitioner further states that the re-trial began in 1995, over five years after his reversal, and eleven years after the offense occurred.

Again, the New Jersey Superior Court contemplated this issue in its letter opinion resulting from Petitioner's PCR motion. The court found that the New Jersey Supreme Court in State v. Sizma adopted a four-factor test previously established by the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 530 (1972), in determining whether Petitioner's right to a speedy trial had been violated.  The court found that although there was a temporal delay in Petitioner's prosecution, satisfying the

first factor of the test, the second factor, reasonableness, was not satisfied.  The court found that the reason for the delay was pellucidly clear as there were several appeals, one reversal, and a delay by the New Jersey Supreme Court in its denial of the State's Motion for Reconsideration and Petition for Certification.  As such, the court found, the delay was completely reasonable.  In view of the foregoing, the court found that Petitioner's assertion that trial counsel was ineffective for failing to motion for dismissal based upon speedy trial violations was "totally without merit."

Again, this Court is compelled to agree.  Any delay in prosecution must be analyzed under the Barker v. Wingo factors. Those factors include length of the delay, reason for the delay, Petitioner's assertion of his right, and the prejudice to Petitioner resulting from the delay.  Although there was a palpable delay in his prosecution, the reasons for the delay are appropriate.  Parties that seek appellate review can expect that the underlying proceedings will be held in abeyance pending the completion of said review.  Petitioner is no exception, as he had instituted several motions for appeal and reconsideration.

Because the delay in Petitioner's prosecution was reasonable, trial counsel committed no error by failing to file a motion to dismiss for unsustainable allegations of speedy trial violations.  Petitioner therefore fails to demonstrate error on

the part of trial counsel, or that the proposed error prejudiced Petitioner.  This Ground for relief will be denied.

### *Ground Five*

Petitioner's next ineffective assistance ground for relief is two-fold.  Petitioner argues that the prosecutor committed <u>Batson</u> violations and that his trial counsel were ineffective for failing to raise an objection to that violation.

The three-part test to determine whether a peremptory challenge is unconstitutionally based on race was set forth by the Supreme Court in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). First, a defendant must show that a peremptory challenge has been exercised on the basis of race.  Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question.  Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.  <u>See</u> <u>id.</u> at 96-98; <u>accord</u> <u>United States v. Milan</u>, 304 F.3d 273, 281 (3d Cir. 2002).

In this case, citing <u>Batson</u>, the Superior Court applied a two-prong test in the context of state law.  <u>See</u> <u>State v. Gilmore</u>, 103 N.J. 508 (1986).  That two-prong test requires that a defendant first show that the excluded members of the venire belong to a cognizable group.  Second, a defendant must prove that there is a substantial likelihood that the peremptory

24

challenges were based on group bias rather than situation-specific bias.

Regarding the case at bar, the court found that although Petitioner satisfied the first prong as the members excluded were African American and Hispanic in origin, the second prong was not met.  Specifically, the court held that while Petitioner alleged misconduct on the part of the prosecutor, he offered no proof of impermissible challenges of the five venire members in question.

When applying the facts of Petitioner's jury impanelment with the prongs of Batson, it is axiomatic that the prosecutor did not improperly utilize peremptory challenges on the basis of race and/or national origin.

First, Petitioner fails to show, simply by stating that five venire members excluded by the prosecutor were African American and Hispanic, that the exclusions were race or origin based, thereby failing the first prong of the Batson test.  Because Petitioner fails the first prong of the Batson test, prongs two and three become inapplicable and no Batson violation can be found.

Further, no cognizable ineffective assistance of counsel claim can exist when a trial counsel fails to set forth a meritless objection.  Therefore, Petitioner's Ground Five will be denied.

25

*Ground Six*

Petitioner's Ground Six alleges that both counsel in his retrial provided ineffective assistance when they asked the trial judge to instruct the prospective jurors that Petitioner was being "retried" for murder.

As the record reflects, before the impanelment of the new jury began, trial counsel expressed their concern that a jury instruction regarding the prior proceeding may be needed, as the jury may wonder why Petitioner's case was coming to trial so many years after the offense occurred.  They also explained there concern that the history of the case as well as the chronology of events as laid out for the jury would necessarily imply a prior proceeding.  Further, the trial judge expressed concern as cross-examination of witnesses using statements they provided at the first trial was possible, if not probable.

In consideration of the concerns of trial counsel and the trial judge, each prospective juror was asked a specific question regarding the prior proceeding, which was as follows:

> There was a previous proceeding in this case, and Mr. Clausell has been granted a new trial by the New Jersey Supreme Court.  The matter is now before us for disposition. And the fact that there has been a previous proceeding is totally irrelevant to us.  This case must be decided solely on the facts in evidence and in accordance with the law which I explain to you.  Is there anything about the fact that there was a prior proceeding which would affect you in any way?

Nowhere in the record does it reflect that the jurors were told that Petitioner was convicted during the first trial.

Petitioner first raised this issue in Superior Court on a motion for PCR.  The court denied Petitioner's claim of ineffective assistance of counsel by holding that trial counsels' request for an instruction to the jury did not rise to a level necessary to satisfy the Strickland standard.  The court addressed the authority cited by Petitioner (Arthur v. Bordenkircher, 715 F.2d 118 (4th Cir. 1983)) by distinguishing its holding.  Specifically, the Arthur court held that it was reversible error on a habeas petition to allow "the jury to receive as its first impression in the case the admitted fact that the defendant had already been convicted of the same crime" and that the retrial was only due to a procedural error.  The Superior Court found that the terms "convicted", "retry" and "procedural error" were never used in front of the jury, and therefore, Arthur was inapplicable to the instant circumstances.

This Court finds that a more analogous case to Petitioner's circumstances is Rowe v. Painter, 2001 WL34554178 (S.D.W.Va. 2001).  There the jury never learned that the defendant had previously been convicted of murdering victim or that the conviction had been reversed on appeal.  The court found that "there is, accordingly, no basis upon which to contend that he

was denied his constitutional right to a 'panel of impartial indifferent jurors' (Murphy v. Florida, 421 U.S. 794, 799 (1975) . . . nor is there any basis for concluding that the references during trial to prior proceedings . . . 'so infected the trial with unfairness as to make the resulting conviction a denial of due process' (Donnelly v. DeChristoforo, 416 U.S. 637 (1974).

In Petitioner's case, the potential jurors were simply informed that there was a "previous proceeding" that had occurred in that case.  They were also specifically instructed that the previous proceeding was "totally irrelevant" for their purposes. There is simply nothing in the instruction to the potential jurors that could influence their deliberations and ultimate verdict.  Absolutely no references were made regarding Petitioner's prior conviction or on what basis the remand occurred.  As such, there was no error committed by the trial court, and if there were, it was in these circumstances, harmless error.

Further, it is evident from the record that Petitioner's counsel, as part of their trial strategy, were attempting to prevent the inevitable inquiries by the jury regarding the length of time that had elapsed from offense to trial, as well as the anticipated references that were going to be made regarding previous testimony.  This Court does not find trial counsels' strategy to be ill-conceived but rather a pragmatic method of

28

informing the jury of the prior proceeding without the resulting prejudice that could occur if it was revealed that Petitioner had previously been convicted by a formerly empaneled jury.

Therefore, Petitioner has failed to show a clear error on trial counsels' part, or that the proposed error prejudiced Petitioner's case. As such, this Ground of habeas relief shall be denied.

### Ground Seven

Petitioner's next ineffective assistance of counsel claim asserts a failure by trial counsel to adequately cross-examine Darrell Atwood, the son of victim Edward Atwood. Specifically, Petitioner alleges that Darrell Atwood testified to seeing shadows of varying sizes at different locations of the Atwood's front door area. Petitioner argues that adequate cross-examination regarding contradictory statements and testimony would have "unearthed truth" that Darrell Atwood was not present and not therefore physically capable of witnessing what he ultimately testified to.

This issue was previously raised as well, and the Superior Court determined that Petitioner failed to meet the Strickland standard. The court found that there was ample evidence beyond Darrell Atwood that placed Petitioner at the victim's home with a gun at the time of the murder. The court further found that trial counsel adequately addressed the inconsistencies in Darrell

29

Atwood's testimony, in keeping with competent representation.  As
such, the court held that Petitioner received a fair trial and
effective representation by trial counsel.

This Court shall so find.  Darrell Atwood was called by the
prosecution and offered his testimony.  Trial counsel for
Petitioner then crossed Darrell Atwood, taking great effort to
point out several inconsistencies in his testimony in a clear
attempt to discredit the witness.  The jury was witness to both
the direct and cross-examinations, and properly left to draw its
own conclusions regarding the veracity of Darrell Atwood.  This
is the method by which witnesses are presented to a jury.  There
is nothing deficient about the method, or the efforts trial
counsel employed during cross-examination.

Further, assuming *arguendo* that trial counsel were
deficient, that deficiency did not prejudice Petitioner as
Darrell Atwood was merely one of several witnesses the State
called to testify which provided damaging evidence placing
Petitioner at the scene of the crime with the murder weapon.

Because trial counsel were not deficient and because
Petitioner was not prejudiced even if they were, this Court shall
deny Petitioner's Ground Seven.

### Ground Nine

In his final ineffective assistance ground for relief,
Petitioner alleges that trial counsel failed to file a motion to

30

disqualify the trial judge after he referred to Petitioner as an "assassin."

This issue, as the others, was before the Superior Court on Petitioner's PCR motion. The court found that trial counsel were not ineffective because the trial judge made the comment outside the presence of the jury, and trial counsel properly objected to the judge's use of the term assassin, which the judge thereafter never used again.

This Court again concurs as the comment by the trial judge fails both prongs of the Strickland standard. The record reflects the events occurring as follows: The alleged comment occurred at least one month prior to the commencement of trial. Trial counsel raised the issue with the trial judge in a letter dated August 18, 1995. The trial began on September 5, 1995. A review of the trial transcripts show no mention of any such comment by the trial judge, nor any other potentially improper comments. The record is clear that the timing of the alleged comment was well outside the scope of time where jurors, potential or otherwise, would have been privy to it.

Trial counsel, therefore, were not ineffective by failing to motion for the disqualification of the trial judge as such a motion would have ultimately been viewed as frivolous. As Petitioner fails both prongs of the Strickland standard in this regard, this ground for relief shall be denied.

31

## Witness Tampering and Prosecutorial Misconduct - Petitioner's Grounds Two and Eight.

Petitioner's next ground for relief (Ground Two) alleges that the State deprived him of due process by hindering the testimony of Petitioner's co-defendant's mother, Carolyn Wright, by sending an investigator to her prior to the trial and telling her that if she testified that her son fired the weapon, he would get the death penalty.

However, Petitioner fails to offer any evidence to support his contention. Although there is in existence an unsworn letter from Carolyn Wright, nowhere in that letter does she assert that she was threatened by an investigator or that any presupposed threat was the basis of her failure to testify.

Indeed, although deference must be given to a pro se Petitioner, this Court is not required to accept bald assertions without some sort of evidentiary support. See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Shaffer v. Meyers, 338 F.Supp.2d 562 (M.D.Pa. 2004). Without more, this Court is required to reject Petitioner's allegations of witness tampering.

It is for these same reasons that this Court rejects Petitioner's next ground for relief (Ground Eight). Here Petitioner argues that he was denied due process because the State presented perjured testimony and fabricated evidence. Specifically, Petitioner argues that Darrell Atwood and Jennifer

32

Schall presented perjured testimony, and that, but for those statements, a jury would not have convicted him.

But again, Petitioner fails to provide any evidentiary support for those allegations. Indeed, the Superior Court, in considering Petitioner's PCR motion, held that Petitioner's argument was "quite plainly unsubstantiated." This Court agrees.

Further, as previously discussed, Darrell Atwood and Jennifer Schall were not the only witnesses that were presented by the prosecution. Independent of their testimony was a substantial amount of additional evidence which supported the State's contention that Petitioner was in possession of a firearm at the Atwood's home at the time of the murder. The jury considered this evidence and found Petitioner guilty. That finding most likely would not have altered had Darrell Atwood and Jennifer Schall not presented "perjured" testimony. Petitioner's Grounds Two and Eight are therefore denied.

### Prosecutorial Vindictiveness - Petitioner's Ground Ten.

Petitioner next argues that the superceding indictment in his case was the product of prosecutorial vindictiveness, as the prosecutor failed to submit an exculpatory statement, specifically, that Dwayne Wright actually fired the weapon, to the grand jury. Petitioner further argues that the prosecutor presented false testimony to the grand jury, which was the only basis for securing the capital count of the indictment.

33

The Superior Court of New Jersey, Appellate Division, considered the issue on appeal and held that "[a] defendant establishes a rebuttable presumption of vindictiveness by showing that the government increased the number or severity of charges upon reindictment after he or she asserted legally-protected rights." (citing Blackledge v. Perry, 417 U.S. 21, 28-29 (1974)). The court determined that "the superceding indictment did not increase defendant's potential sentence and included fewer counts that the original indictment . . . [t]he presumption of vindictiveness is not [therefore] applicable." The court went on to find:

> [N]onetheless, even where the presumption of vindictiveness is not applicable, a defendant can still attempt to prove actual vindictiveness. U.S. v. Goodwin, 457 U.S. 368, 384 (1982). However, defendant cannot succeed in establishing actual vindictiveness because the superceding indictment was obviously obtained to address defendant's discovery of a procedural irregularity . . . [T]he superceding indictment was not secured to punish defendant for pursuing an appeal. The trial judge did not err in denying defendant's motion to dismiss the superceding indictment because there was no evidence, presumed or actual, that the indictment was obtained as a result of prosecutorial vindictiveness.

The State Appellate Division applied relevant federal precedent which remains the applicable federal law today. The basis for the prosecutor seeking a superceding indictment was a procedural failure contained within the initial indictment pursuant to post-indictment New Jersey Supreme Court decision, State v. Gerald, 113 N.J. 40 (1988), in which the Court

determined that the legislature had made a distinction between a principal and an accomplice in capital cases. Gerald became the controlling law at the time, and pursuant to Petitioner's own motion regarding the decision in Gerald, the prosecutor corrected the procedural error with the utilization of a second grand jury, resulting in a superceding indictment. However, as the Appellate Division found, that superceding indictment resulted in less counts and did not place Petitioner in a position where he faced additional jail time.

This Court finds that because the alteration was based upon an after-arising procedural error that actually reduced the amount of counts Petitioner was facing, Petitioner fails both the Blackledge and Goodwin prosecutorial vindictiveness tests.

In Ground Ten, Petitioner also alleges that the prosecutor failed to submit exculpatory statements to the second grand jury. Specifically, Petitioner argues that the prosecutor withheld portions of statements from several detectives in which witnesses indicated that Wright, not Petitioner, was the shooter.

Applying relevant state law, the New Jersey Appellate Division held that the trial judge had not erred when he denied Petitioner's motion to dismiss the indictment. The Appellate Division found that "[B]ecause defendant's and Wright's comments to Schall were highly unreliable, their statements were not

35

'clearly exculpatory.'  The prosecutor was not obligated to submit them to the grand jury."

This Court, in applying relevant federal law, agrees with the State Appellate Division.  In the United States Supreme Court decision <u>United States v. Williams</u>, 504 U.S. 36 (1992), the Court held that a district court may not dismiss an otherwise valid indictment because the government failed to disclose to the grand jury exculpatory evidence in its possession.  Even if exculpatory evidence was required to be presented, the Third Circuit in <u>Hochman v. Rafferty</u>, 831 F.2d 1199, 1204 (3rd Cir. 1987) held that a prosecutor is required to present only "*clearly exculpatory evidence*" to the grand jury.  (Emphasis added).

Under either standard, Petitioner's argument fails.  The statement by Carolyn Wright regarding whether Petitioner was the shooter to which Petitioner specifically refers has consistently been the basis for grounds of relief asserted by Petitioner.  And for each of these grounds, this Court has held that the Carolyn Wright statement has been rejected as unreliable as it was unsworn and unattested to, and failed to serve as the "smoking gun" Petitioner hoped it would serve.  This Court has also found, <u>supra</u>, that the evidence presented by the State was too great to sway the jury from its verdict of guilty.  In other words, Carolyn Wright's letter is not *clearly* exculpatory, and even if

it were, the prosecutor was not required to disclose it to the grand jury. Petitioner's Ground Ten is denied.

## Prosecutorial Misconduct - Petitioner's Ground Eleven.

Petitioner next asserts that the prosecutor knowingly presented false testimony to the grand jury.

During the grand jury testimony, the detective testified that Lorenzo Werts told him that Darrell Cherry directed Werts that Roland Bartlett wanted "the dogs" put on Mr. Atwood, meaning that he wanted Petitioner and Wright to kill Mr. Atwood. The prosecutor then asked whether the instructions were to "hit" Mr. Atwood, and the detective responded that they were. Petitioner argues that there was no evidence that Bartlett instructed that Mr. Atwood be killed and, therefore, the detective's testimony was perjured.

Additionally, Petitioner argues that the detective presented false testimony when he testified that Werts had given Petitioner the gun. At trial, it was revealed that Cherry had given Wright the gun.

The New Jersey Appellate Division considered these same arguments and concluded, in accordance with United States v. Pino, 708 F.2d 523, 530-31 (10th Cir. 1983), that the proposed "perjured" testimony would not have ultimately changed the grand jury's decision. As such, the Appellate Court held, the superceding indictment was properly obtained.

37

It has been consistently held that the unknowing presentation of perjured testimony by a government entity is not sufficient to warrant reversal of a conviction where the subsequent petit jury found guilt beyond a reasonable doubt(see United States v. Soto-Beniquez, 356 F.3d 1 (1st Cir. 2004)), which is the situation Petitioner presents here.  Further, there is absolutely no indication that the absence of the perjured testimony would have ultimately changed the grand jury's decision, as additional evidence was presented to said grand jury which was independent of the allegedly "perjured" testimony, and as said evidence would have been sufficient for the grand jury to return the indictment in a true bill.

Therefore, Petitioner's Ground Eleven shall be denied.

**Violation of Right to Fair Trial - Petitioner's Ground Twelve.**

Petitioner's next assertion argues that he was improperly charged with capital murder, because there was no evidence to support the charge.  As a result, trial counsel was preoccupied with trying to avoid the death penalty, and not focusing on the truth regarding his case.

Again, the New Jersey Appellate Division had previously addressed this very issue and held that there was "ample" evidence to support the prosecutor's decision to seek the death penalty, which was ultimately validated by a petit jury verdict of guilty.

This Court once again agrees. There is absolutely no suggestion in the record that the State's evidence did not support a capital murder charge. Indeed, shooting an individual for money is completely consistent with capital murder. The facts fit the charge utterly and completely, and as such, Petitioner fails to demonstrate on any level that the State improperly charged him.

Further, Petitioner's attempts to attach a constitutional violation to trial strategy is ill-conceived. Trial strategy which focused upon preserving Petitioner's life in the face of the charges pending against Petitioner is not only appropriate, its necessary. Certainly hindsight is twenty/twenty. Petitioner did not receive the death penalty, and therefore now focusing on the length of incarceration. That is a luxury that trial counsel did not have at the time.

Additionally, there is no evidence available to suggest that there was not efforts taken by trial counsel to obtain an acquittal, or at least minimize the amount of incarceration Petitioner faced.

Finally, as previously discussed, trial strategy shall not be second-guessed absent extraordinary negligence. As such, Petitioner's Ground Twelve is denied.

## Admittance of Gun at Trial - Petitioner's Ground Thirteen.

Petitioner's final ground for relief alleges that the trial judge erred by admitting the gun into evidence. Petitioner argues that the State did not establish a chain of custody for the gun and that there was insufficient evidence to establish that the gun was used in the murder.

Again, the Superior Court of New Jersey, Appellate Division had occasion to consider this very issue as previously raised by Petitioner. The court held, pursuant to state law, that there was no inference of irregularity or tampering to support a chain of custody issue and that the gun was properly admitted by the trial court.

The record reflects the following events regarding the chain of custody of the firearm in question. Specifically, Werts identified State Exhibit S-11, a .357 Magnum, as the gun that Cherry had given him after the shooting. According to Werts, Cherry had told him to destroy S-11, but instead he hid it in his house and in 1987 gave it to the State. Werts testified, however, that S-11 was not the gun that he had given to Cherry to sell to Petitioner, thereby implying that it was not the gun used in the shooting. Werts initially described that gun as a .44 or .357 Magnum, but later testified that the gun was a .38 Smith and Wesson, with a brown handle. There was no testimony as to the whereabouts of that gun, if in fact it existed.

40

During the Bartlett trial, Cherry had identified S-11 as the gun he sold to defendant, implying that it was the gun used in the shooting, and that testimony was admitted as evidence in this trial.

Trial counsel for Petitioner objected to the introduction of the S-11 gun into evidence on the basis that the State had not established a chain of custody and that S-11 had not been identified as the gun that was used in the shooting.  The trial judge held that S-11 was admissible and found that there was sufficient evidence to support the inference that S-11 was the gun used in the shooting.

Pursuant to Third Circuit precedent, "[t]o establish a chain of custody, the government need only show that it took reasonable precautions to preserve the evidence in its original condition, even if all possibilities of tampering are not excluded."  United States v. Dent, 149 F.3d 180, 188 (3d Cir. 1998).  Further, "[a]bsent actual evidence of tampering, a trial court may presume regularity in public officials' handling of contraband."  Id.  A trial court's decision to admit such evidence should not be disturbed absent a clear abuse of discretion.  Id. at 189.  Finally, a defect in the chain of custody goes to the weight of the evidence, not to its admissibility.  United States v. Matta-Ballesteros, 71 F.3d 754 (9th Cir. 1995).

41

In the case at bar, there is no evidence provided by Petitioner that reflects tampering of the gun. Potentially, Petitioner shows a break in the chain of custody of said gun, however, that issue is for a jury to consider, not for a trial judge to utilize to permit its admissibility. Id. Because Petitioner fails to show that the gun was improperly admitted into evidence, his last ground for relief shall be denied.

### CONCLUSION

For the foregoing reasons, the petitioner's application for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is hereby **DENIED**. An appropriate Order accompanies this Opinion.

The Court further finds that no certificate of appealability will issue because the petitioner has not made a substantial showing of the denial of a constitutional right, as required by 28 U.S.C. § 2253.

HONORABLE NOEL L. HILLMAN
United States District Judge

Dated: September 29th, 2006

At Camden, New Jersey

42